# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge William J. Martínez

Criminal Case No. 18-cr-286-WJM

UNITED STATES OF AMERICA,

 Plaintiff,

v.

1.  **MARVIN SAKORI MALEIK DUDLEY**,

 Defendant.

---

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS STATEMENTS (ECF NO. 38) AND DENYING MOTION TO SUPPRESS (ECF NO. 37)

---

 The Government charges Defendant Marvin Sakori Maleik Dudley ("Dudley") with possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii); possession of a firearm as a felon, 18 U.S.C. § 922(g)(1); and possession of a firearm during and in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A)(i). (ECF No. 22 at 1–2.) Dudley filed a Motion to Suppress Statements (ECF No. 38) and a Motion to Suppress all evidence resulting from the allegedly illegal stop (ECF No. 37) (together, "Motions"). For the reasons explained below, the Court grants in part and denies in part the Motion to Suppress Statements (ECF No. 38), and denies the Motion to Suppress (ECF No. 37).

## I. BACKGROUND

 On April 28, 2018, Denver Police Department ("DPD") Officers Heather Jossi and Gavin Whitman were on patrol driving a marked DPD vehicle. Around 9:20 p.m., the officers observed a gold Suzuki sedan with Colorado license plate ONH737 at the gas

pumps of a 7-Eleven and Conoco ("7-Eleven") located at 1000 East Colfax Avenue, Denver, Colorado. While Officer Whitman drove, Officer Jossi ran the licence plate through the National Crime Information Center and Colorado Crime Information Center on her in-car computer to check the status of the vehicle. The officers learned that the vehicle had been reported stolen on April 16, 2018, and called for additional officers to assist in their investigation of a potentially stolen vehicle. While the officers were checking the status of the vehicle, the driver, later identified as Dudley, moved the car from the gas pump to a parking spot in front of the doors to the 7-Eleven.

Officers Jossi and Whitman decided to contact Dudley "for fear that he would walk off" and initiated a high-risk traffic stop. (ECF No. 37-1 at 1, 3.) Officer Whitman turned on his vehicle's emergency lights and parked behind Dudley, blocking him into the parking spot. Officer Jossi approached the vehicle on the passenger's side and Officer Whitman approached on the driver's side, both with guns drawn. Within approximately 20 seconds of Officer Whitman stopping his vehicle behind Dudley's, two other units arrived with an additional four officers, who also drew their weapons.

Officer Whitman ordered Dudley to exit the vehicle. Dudley did not immediately exit, but rather asked why he had been stopped and stated that he was afraid because the officers had their guns drawn and pointed at him. Dudley eventually placed the vehicle in park, took off his seatbelt, and exited the vehicle with his hands raised.

Immediately after Dudley got out of the car, the officers placed him in handcuffs. Officers inquired whether he had any weapons or a gun on his person, and Dudley stated that he had a gun in a holster. Officer Mejia felt what he thought was a firearm on Dudley's right side near his waist. Officer Mejia recovered a Kahr Arms model

2

CW45, serial number SF9024, with seven rounds of ammunition in the magazine.[1]

According to bodyworn camera footage of several officers submitted by Dudley,[2] Dudley then had a medical incident in the parking lot, during which time he sat on the ground. Officers asked Dudley several questions, including his name, last time he was arrested, whether he had ever gone to prison, and where he acquired the weapon. Several minutes later, when Dudley was able to stand and move to the backseat of a patrol car, the officers searched Dudley and bagged the possessions on his body. At that time, they found a green Crown Royal bag tied around Dudley's belt loop and hanging down inside Dudley's pants. Officer Mejia removed the bag, looked inside, and found two separate plastic bags containing suspected methamphetamine.[3] Officers then sat Dudley in the back of a patrol vehicle.

Officer Whitman then met with Dudley and advised him of his *Miranda* rights. Dudley expressly agreed to talk with the officers and answer questions. During this conversation, Dudley stated that the owner of the vehicle let him use the vehicle until she could pay for $80 worth of heroin, and that she had likely reported the car stolen several days ago. Dudley also stated that he acquired the firearm from a person who brings him guns. Officers also stated that Dudley seemed to have a lot of

---

[1] Officers later searched the serial number and determined that the gun was reported stolen by the Aurora Police Department with a theft date of July 29, 2015.

[2] Dudley submitted footage from several different officers' bodyworn cameras. He did not identify what footage corresponded with which officer.

[3] DPD Foresnic Chemist Jason Schimschal tested the suspected methamphetamine. The first bag tested positive for 11.79 grams of methampetamine at a purity level of 85.26%, or 9.991 grams of pure methamphetamine. The other bag contained 6.3 grams of methamphetamine in 22 individual baggies. The 6.3 grams were tested only for type of substance and not for purity.

methamphetamine on him, and inquired whether he was in downtown Denver to sell it. In response, Dudley stated that he "had pounds of that [inaudible]."

## II. BURDEN OF PROOF

On a motion to suppress evidence obtained from a warrantless search or seizure, the defendant bears the burden of presenting a *prima facie* case that the Fourth Amendment has been "implicated," at which point the burden shifts to the Government to prove "that its warrantless actions were justified (*i.e.*, as a lawful investigatory stop, or under some other exception to the warrant requirement)." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also id*. at nn.1–2 (citing authorities); 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at n.35 and accompanying text (5th ed., Oct. 2018 update).

Similarly, where a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), is alleged, once a defendant presents evidence or allegations sufficient to support a motion to suppress, "the Government must then carry the countervailing burden of proving a waiver of the constitutional privilege against self-incrimination." *United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975) *abrogated on other grounds by United States v. Bustillos-Munoz*, 235 F.3d 505, 516 (10th Cir. 2000); *United States v. Fountain*, 776 F.2d 878, 886 (10th Cir. 1985); *Bond v. United States*, 397 F.2d 162, 165 (10th Cir. 1968).

## III. ANALYSIS

A. **Initial Stop and Arrest (ECF No. 37)**

Dudley contends that the officers did not have probable cause to stop and arrest

4

him, and therefore the "high-risk traffic stop" at gunpoint and subsequent seizure violated the Fourth Amendment. (ECF No. 37 at 5.) Dudley adds that even if the officers did have probable cause, "their conduct went well beyond the scope of what was reasonable under the circumstances." (*Id.* at 8.) Therefore, Dudley contends, the exclusionary rule should apply and all evidence and statements subsequent to the illegal seizure should be suppressed. (*Id.* at 5.) In response, the Government argues that the warrantless felony arrest was based on probable cause and lawful under the circumstances. (ECF No. 43 at 9.)

Dudley is incorrect: the DPD officers had probable cause to stop and arrest Dudley on suspicion of driving a stolen vehicle. The Tenth Circuit has held that a "NCIC report indicating that the vehicle had been reported as stolen, as relayed to the officers by the dispatcher, was sufficient to provide probable cause for the arrest." *Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 216 (10th Cir. 2002); *see also Dorato v. Smith*, 108 F. Supp. 3d 1064, 1143 (D.N.M. 2015) (collecting cases). *Miller*, *Dorado*, and the caselaw cited therein make clear that an NCIC report alone is sufficient to provide probable cause for arrest; contrary to what Dudley argues, no "confirmation . . . made via radio to verify the result of a computer query" is necessary. *Miller*, 42 F. App'x at 216; *Dorato*, 108 F. Supp. 3d at 1143. (ECF No. 37 at 8.)

Here, Officers Jossi and Whitman learned that the car in question had been reported stolen, and therefore had probable cause to stop the vehicle and arrest the driver; or, at a minimum, the relatively short amount of time between the car being reported stolen and this incident gave the officers probable cause to suspect that the

5

driver of the car was, or was associated with, the car thief.

Dudley argues that, even if the officers had probable cause, their conduct—particularly their decisions to conduct a "high-risk traffic stop" and order Dudley out of the car at gunpoint—was nonetheless unreasonable. Dudley cites no case law in support of his argument that officer conduct is unreasonable when they perform a high-risk traffic stop based only on the knowledge that a vehicle has been reported stolen. Under the facts presented, the Court sees no reason to find that the arrest violated the Fourth Amendment, and therefore no reason that the evidence recovered as a result should be suppressed. The Court therefore denies Dudley's Motion to Suppress all evidence stemming from the arrest (ECF No. 37).

B.  **Pre-*Miranda* Statements (ECF No. 38)**

The conclusion that DPD officers had probable cause to arrest Dudley does not end the inquiry of whether his statements should be suppressed. Dudley argues that he was under arrest from the moment he exited the vehicle and placed in handcuffs. (ECF No. 37 at 4.) The Government does not appear to dispute this sequence of events, other than to suggest that after Dudley exited the vehicle and was handcuffed, he made "initial statements" about his identity and whether he was armed before being placed under arrest. (ECF No. 43 at 8.) Absent any real argument from the Government that Dudley was in investigative detention or some other status short of custodial detention or arrest from the moment he exited the car, the Court will presume that Dudley was under arrest at least from the time he exited the vehicle and was placed in handcuffs. Given the gap in time between his arrest and the *Miranda*

6

advisement, the Court will review the admissibility of Dudley's pre-*Miranda* statements.[4]

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect's statements are generally inadmissible as violative of the Fifth Amendment if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver. *Id*. at 444, 478–79. But, "[i]t is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, *Miranda* only applies when an individual is subject to custodial interrogation." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (internal quotation marks and citation omitted). "Thus[,] two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

Concerning custody,

> a person is not in custody for *Miranda* purposes unless his freedom of action is curtailed to a degree associated with formal arrest. Furthermore, *Miranda*'s "in custody" requirement is measured objectively, the proper inquiry being whether a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest.

*Hudson*, 210 F.3d at 1190 (internal quotation marks and citation omitted; alterations incorporated). Concerning the second *Miranda* requirement, interrogation, it "refers not

---

[4] While Dudley appears to initially raise a question of whether the *Miranda* advisement and subsequent waiver were proper (*see* ECF No. 38 at 2), he does not pursue or make any further argument on this theory (*id.* at 4 ("Dudley does appear to acknowledge an understanding of his rights and agree to speak with officers.")). Nor does Dudley argue that his pre-*Miranda* statements render his post-*Miranda* statements inadmissible. The Court will therefore not review whether the post-*Miranda* statements should be suppressed.

7

only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). This definition focuses on the coercive effect of the officers' words or actions on the suspect. *Id*.

The *Miranda* requirement has two exemptions at issue in this case: routine booking questions and public safety. "[Q]uestions about a person's identity and the disclosure of a person's name and address are not generally subject to the protections of *Miranda*." *United States v. Medrano*, 356 F. App'x 102, 107 (10th Cir. 2009). "The underlying rational for the exception is that routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses." *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993).

The public safety exception allows officers to ask "focused questions" that address a "real and substantial risk to the safety of officers and Defendant." *United States v. Lackey*, 334 F.3d 1224, 1227–28 (10th Cir. 2003) (allowing pre-*Miranda* question asking arrested defendant if he had any guns or sharp objects on him); *see New York v. Quarles*, 467 U.S. 649, 657 (1984) ("[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."). Under *Quarles*, an officer may ask questions to a suspect in custody prior to a *Miranda* warning if the questions arise out of "an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." 467 U.S.

8

at 659 n.8. "[F]or an officer to have a reasonable belief that he is in danger, at minimum, he must have a reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *United States v. DeJear*, 552 F.3d 1196, 1201–02 (10th Cir. 2009) (quoting *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007)).

Dudley contends that he was subject to interrogation between exiting the vehicle and being read his *Miranda* rights. (ECF No. 38 at 4.) Specifically, Dudley argues that questions about his criminal record and his possession of certain items were improper interrogation. (*Id.*) The Government contends that questions regarding Dudley's identity and possession of weapons fall within the routine booking and public safety exceptions to *Miranda*, but does not otherwise address the officers' questions and Dudley's responses. (ECF No. 43 at 8.) The parties do not appear to dispute that Dudley was in custody, or that questions the officers asked during the period between arresting Dudley and reading his *Miranda* rights qualify as interrogation.

The Court finds that questions regarding Dudley's identity fall within the routine booking questions exception to *Miranda*, and thus are not subject to being suppressed.

The Court finds, however, that the remainder of the questions and responses between Dudley exiting the vehicle and receiving his *Miranda* rights must be suppressed. The Government conclusorily argues that the public safety exception applies to questions about weapons in Dudley's possession at the time of arrest, but fails to articulate whether any officer had reason to believe that Dudley might have a

9

weapon, much less that someone other than the police might gain access to any weapon. *See DeJear*, 552 F.3d at 1201–02. Absent a reasonable belief that Dudley had a weapon, the public safety exception to *Miranda* does not apply, and his affirmative statement that he possessed a firearm must be suppressed. *Id.* To be clear, only the statement, and not the firearm itself, will be suppressed.

In addition, the Government has supplied no justification for the other questions the officers asked Dudley before he received his *Miranda* rights, or argued that the exchanges were not interrogation. The Court concludes that the questions on the subjects identified below were reasonably likely to elicit an incriminating response. *See United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993). Therefore, in addition to suppressing the statements about Dudley's possession of a weapon, the Court will also suppress statements made during the time between Dudley exiting the vehicle and receiving his *Miranda* rights on the following topics:

- Whether Dudley's firearm is permitted or registered;
- The source of the firearm found on Dudley;
- Dudley's history of arrest and incarceration;
- Dudley's knowledge that the vehicle was stolen; and
- The contents of the green bag tied to Dudley's pants.

(*See* ECF No. 38-1 (excerpts of bodyworn camera footage in file "Arrest_POWPO-file 2"); ECF No. 37-4 (excerpts of bodyworn camera footage in file "ARST_Auto_Theft-Pcs").)

## IV. CONCLUSION

For the reasons set forth above, the Court rules as follows:

1. Defendant's Motion to Suppress (ECF No. 37) is DENIED;

2. Defendant's Motion to Suppress Statements (ECF No. 38) is GRANTED IN PART as to the following statements made between Defendant exiting his vehicle and receiving his *Miranda* rights:

   a. Defendant's possession of a firearm or other weapon;

   b. Whether Defendant's firearm is permitted or registered;

   c. The source of Defendant's weapon;

   d. Defendant's history of arrest and incarceration;

   e. Defendant's knowledge that the vehicle was stolen; and

   f. The contents of the green bag tied to Defendant's pants.

   The remainder of the Motion is DENIED.

3. By way of a separate order, the Court will set a new trial date, a Final Trial Preparation Conference, and related deadlines.

Dated this 28th day of March, 2019.

BY THE COURT:

William J. Martínez
United States District Judge