# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge William J. Martínez

Criminal Case No. 18-cr-286-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.     **MARVIN SAKORI MALEIK DUDLEY**,

    Defendant.

---

## ORDER DENYING MOTION TO DISMISS

---

The Government charges Defendant Marvin Sakori Maleik Dudley ("Dudley") with possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii); possession of a firearm during and in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A)(i); and possession of a firearm as a felon, 18 U.S.C. § 922(g)(1). (ECF No. 22 at 1–2.) Dudley moves to dismiss the case against him, alleging that the Government destroyed exculpatory evidence, and asks for a hearing (the "Motion"). (ECF No. 72.) The Court has reviewed the parties' briefing and finds that no hearing is necessary. For the reasons discussed below, the Court denies the Motion.

## I. BACKGROUND

The Court has previously recounted the facts of this case in its Order granting in part and denying in part Dudley's Motion to Suppress. (ECF No. 58.) The Court presumes familiarity with that prior Order, and thus briefly recounts only the facts

relevant to the instant Motion.

On April 28, 2018, Denver Police Department ("DPD") Officers Heather Jossi and Gavin Whitman ran the license plate number of a gold Suzuki sedan with Colorado license plate ONH737. The officers learned that the vehicle had been reported stolen on April 16, 2018, and initiated a high-risk traffic stop of the vehicle in a 7-Eleven parking lot at 1000 East Colfax Avenue, Denver, Colorado. Other officers joined to conduct the high-risk stop.

Officer Whitman ordered Dudley to exit the vehicle. Once Dudley stepped out of the car, officers immediately placed him in handcuffs. Dudley informed the officers that he was carrying a gun, and officers removed the weapon from Dudley's waistband.

Prior to seating Dudley in the back of a police car, several officers searched Dudley and found a green Crown Royal bag hanging from Dudley's belt loop and tucked inside his pants. The officers removed the bag, looked inside, and found two separate plastic bags containing suspected methamphetamine. Officers also searched the car that Dudley was driving, and recovered a number of items.

The officers filled out a DPD "Property Invoice" for the items found on Dudley and in the vehicle. (ECF No. 72-2.) The Property Invoice listed, among other things, $319 in U.S. currency, the two bags of suspected methamphetamine (one of which contained a number of smaller baggies of suspected methamphetamine), a digital scale, and "pipes." (*Id.*) At the scene, Officer Jossi described the pipes as "drug paraphernalia." The majority of the items were booked as evidence, but the pipes were designated as "personal property." (*Id.*) Under DPD policy, items designated as personal property have "no evidentiary value but must be held for safekeeping for the

2

owner." (ECF No. 81-1 at 2.) Personal property is held by DPD for 30 days, after which time it is "disposed of or sold at public auction." (*Id.* at 5.) The pipes were subsequently destroyed. Dudley characterizes this situation as Officer Jossi authorizing the destruction of the two drug paraphernalia pipes. (ECF No. 72 at 3.)

The officers advised Dudley of his rights, and he agreed to speak with them. Dudley stated that the owner of the vehicle had loaned her car to him for $80 worth of heroin. He surmised that the owner had likely reported the vehicle stolen, rather than pay the $80. The officers then asked Dudley if he was in the area trying to sell the drugs found in the Crown Royal bag. Dudley said no. The officers suggested that the quantity Dudley was carrying was greater than what they normally found on persons in the area. To this, Dudley replied that he "had pounds of that [inaudible]."[1]

DPD Foresnic Chemist Jason Schimschal tested the suspected methamphetamine. (ECF No. 77 at 4.) The first bag tested positive for 11.79 grams of methamphetamine at a purity level of 85.26%, or 9.991 grams of pure methamphetamine. The other bag contained 6.3 grams of methamphetamine in 22 individual baggies. The 6.3 grams were tested only for type of substance and not for purity.

## II. ANALYSIS

Dudley argues that the Government violated his right to due process by destroying exculpatory evidence, and thus asks the Court to dismiss the indictment.

*California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488

---

[1] While the audio on this part of the body-worn camera footage is not clear, it sounds as if Dudley says "pounds of that shit" or something similar, referring to methamphetamine.

U.S. 51 (1988), set forth the standards used to determine whether the Government violated a defendant's right to due process through the destruction of evidence. The Government violates a defendant's due process when it fails to preserve or destroys evidence with "an exculpatory value that was apparent before it was destroyed" and "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. In *Trombetta*, the Supreme Court noted that, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488.

In *Youngblood*, the Supreme Court clarified that the Due Process Clause does not "impos[e] on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. Instead, if the item is of indeterminate evidentiary value or only potentially useful—*i.e.*, "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"—there is no due process violation unless the defendant proves the state acted in bad faith by destroying or failing to preserve the evidence. *Id.* at 57–58. The Supreme Court specifically noted that "the police do not have a constitutional duty to perform any particular tests" and "the Due Process Clause is [not] violated when the police fail to use a particular investigatory tool." *Id.* at 59.

Under *Youngblood*, a defendant must demonstrate (a) that the evidence destroyed or lost was potentially exculpatory, and (b) that the Government acted in bad

4

faith when disposing of the evidence. *See United States v. Bohl*, 25 F.3d 904, 910–11 (10th Cir. 1994). To determine whether the Government acted in bad faith, the Tenth Circuit considers whether (1) the Government had knowledge or notice of the exculpatory value of the evidence at the time it was lost or destroyed; (2) a defendant's assertion of potentially exculpatory value is "not merely conclusory, but instead . . . backed up with objective, independent evidence giving the [G]overment reason to believe that further tests . . . might lead to exculpatory evidence"; (3) the Government had possession of the evidence when it received notice about the potential exculpatory value; (4) the evidence is central to the Government's case; (5) the Government has offered an innocent explanation for its failure to preserve the evidence; and (6) "the destruction of the evidence was in accordance with standard procedure and the evidence was adequately documented prior to its destruction." *Id.* at 911–12; *United States v. Smith*, 534 F.3d 1211, 1225 (10th Cir. 2008); *United States v. Ward*, 182 F. App'x 779, 785 (10th Cir. 2006).

Dudley contends that the two drug paraphernalia pipes seized during his arrest were exculpatory evidence destroyed by the Government. (ECF No. 72 at 7.) He claims that had the pipes been tested for illicit substances, fingerprints, and DNA, instead of being destroyed, the results would have shown traces of methamphetamine and Dudley's fingerprints or DNA. Dudley further claims that this evidence would have demonstrated that he was a user, not a dealer. Thus, Dudley continues, the pipes would have been exculpatory evidence on the charges of possession with intent to distribute and possession of a firearm in furtherance of drug trafficking.

5

Dudley also seeks an evidentiary hearing, contending that because the evidence was "potentially useful" to his defense, whether the Government acted in bad faith is squarely at issue, and such a determination involves factual questions that require a hearing. (ECF No. 72 at 5–6.)

The Court finds that Dudley has failed to demonstrate the "apparent" exculpatory evidence on the record before the Court. *See Trombetta*, 467 U.S. at 489. The exculpatory nature of the pipes lay "only in the potential results that might be obtained from further tests," and thus "the exculpatory value was latent, rather than patent, and it was not apparent at the time of the destruction." *See Bohl*, 25 F.3d at 910. Accordingly, the appropriate test is *Youngblood*, not *Trombetta*.

Turning to the first prong of *Youngblood*, the Court agrees with the Government that the exculpatory value of the destroyed pipes is "at best indeterminate" and, at most, potentially useful for the defense. *See Bohl*, 25 F.3d at 910. The Court will assume for purposes of analysis that the evidence obtained from testing the pipes would have potentially been useful to Dudley.

The Court thus turns to the question of bad faith, on which the defendant bears the burden of proof. Bad faith is a mixed question of law in which "'the quintessential factual question of intent' predominates." *See Bohl*, 25 F.3d at 909. Dudley claims that "information received by the defense to date indicates bad faith exists," and thus asks for an evidentiary hearing to present evidence to meet his burden to prove bad faith. (ECF No. 81 at 3.) *See Smith*, 534 F.3d at 1224 (defendant bears the burden to show bad faith). Dudley has made only speculative, conclusory allegations that the officers

6

knew of the exculpatory value of the pipes before they were destroyed, and fails to sufficiently address what information could be presented at a hearing that would factually bolster his allegations of bad faith. Based on the facts before the Court, the Court finds that no hearing is necessary.

The Court finds that the Government did not have notice or knowledge of the potentially exculpatory value of the pipes when they were designated as "personal property" rather than "evidence." Dudley argues that he "told the officers the pipes had exculpatory value before they were destroyed." (ECF No. 81 at 3.) Dudley does not clarify when he stated any such thing to the officers. At best, Dudley's own denial that he intended to sell the methamphetamine could have potentially alerted the officers that he was carrying the drugs for personal use, rather than selling them.

However, the officers' comments when questioning Dudley suggest that the quantity of methamphetamine Dudley was carrying was much greater than an average user would possess (particularly on his person), and more consistent with Dudley distributing the controlled substance. In addition, the officers found a digital scale (consistent with distribution) and $319 in cash. Dudley's remarks to the officers indicated that he was involved in distribution of narcotics; he openly admitted that he had traded the car he was driving for $80 worth of heroin. Dudley also suggested that he had "pounds" of narcotics elsewhere.

Under these circumstances, the officers had little reason to think that the amount of methamphetamine Dudley was carrying was for personal use only. The statements made by Dudley, combined with the facts and circumstances at the time of his arrest, were insufficient to put the officers on notice that the pipes might be exculpatory in

7

nature (whether or not they contained trace amounts of methamphetamine and Dudley's DNA or fingerprints).

In addition, the potential exculpatory value does not rise above speculation or conjecture: Dudley simply posits that his DNA, fingerprints, and trace amounts of methamphetamine would have been on the pipes. (ECF No. 72 at 5.) This statement is not backed up by any credible evidence.

By the time the Government learned that Dudley believed the pipes to be exculpatory—at the time Dudley filed the instant motion (*see* ECF No. 77 at 8)—the Government no longer had possession of the pipes. Thus, by the time the Government was on notice that the pipes could contain potentially exculpatory information, it was no longer in control of the pipes.

Moreover, as the Government explains in its response, the pipes are not central to the Government's case. The quantity of drugs found on Dudley's person, the other physical evidence (currency and digital scale), his statements at the time of his arrest, how he obtained the stolen vehicle, and the officers' body-worn camera footage of the events in question are, according to the Government, "more probative on the issue of the guilt of this defendant." (ECF No. 77 at 8.)

The only factor that weighs slightly in favor of Dudley is that the Government does not explicitly offer any "innocent reason" for the destruction of the pipes. (ECF No. 81 at 4.) However, the Government's overall argument is that the DPD destroyed the pipes because they were not considered evidence at the time of the arrest, much less exculpatory evidence, and therefore not preserved. (ECF No. 77 at 7–8.) On the inventory list, Officer Jossi recorded the pipes as "personal property," which, according

to DPD policy, is a designation used for "property that has no evidentiary value." (ECF No. 72-2; ECF No. 81-1 at 2.) The DPD policy also provides for a limited retention period of personal property, after which time the property may be disposed of or sold at public auction. (ECF No. 81-1 at 2.) The designation as personal property, however, further supports that the officers simply did not know that the pipes could have any evidentiary value—exculpatory or otherwise—at the time of the arrest.

Considering the totality of the evidence and weighing the bad faith factors, the Court concludes that Dudley has not presented sufficient evidence to establish that the officers acted in bad faith. *See Smith*, 534 F.3d at 1225. The Court's ruling today does not preclude Dudley from raising the issue of destruction of the pipes at trial.

### III.  CONCLUSION

For the reasons set forth above, the Court rules as follows:

1.  Defendant's Motion to Dismiss for Destruction of Exculpatory Evidence and For Evidentiary Hearing (ECF No. 72) is DENIED; and

2.  By way of a separate order, the Court will set a new trial date, a Final Trial Preparation Conference, and related deadlines.

Dated this 31st day of October, 2019.

BY THE COURT:

_____
William J. Martínez
United States District Judge